Good morning, Your Honors. May it please the Court, I'm Daniel Barrow, representing the City of Palos Verdes Estates and the other defendants. I'd like to reserve five minutes of my time for rebuttal. You may, and watch the clock. This case has been supplemental briefed to death, and so I'm just going to... I agree with you on that. Yes. So I'm just going to try to narrow it down. When Congress passed the Telecommunications Act about 12 years ago, they had the choice of whether to have national standards for siting this equipment, or whether to localize those decisions. They chose to localize them, and one of the reasons was that municipalities had legitimate state and local interests in siting these facilities, including aesthetic values, according to the Voice Dream v. St. Croix case from the Third Circuit mentioned in the briefs. It would be ironic if that reason for localization prevented municipalities from regulating these facilities based on aesthetic values. May I ask you a question? One of the reasons given for denying the permits was to maintain high property values. Do you consider that an aesthetic ground? To the extent that property values are based on aesthetics, yes. I consider that the interest of a property owner in maintaining the private property in a beautiful condition is important, along with the interest of somebody who's coming into Palos Verdes Estates to use the parkland or ride a bike around there. Does the city get property tax income based on the value of the properties? I don't know the answer to that question, Your Honor. But it is important to keep in mind that to the extent property values are based on aesthetics, that is a proper interest according to Congress when it passed this Telecommunications Act. It is also important when you look at this Court's decisions in Metro PCS v. San Francisco, and more recently in Sprint v. County of San Diego, both talk about the importance of aesthetic values under the Telecommunications Act. Are you suggesting that if the city saw fit to do so for aesthetic reasons, they could prohibit all cell service in the city? Absolutely not. The Metro PCS, the Court said no, that could not be done. That would be indisputably a prohibition under 253 and 332 of the Telecommunications Act. And that takes us to whether there is a significant gap in coverage, doesn't it? It does take us to whether there is a significant gap in coverage and whether the means chosen by Sprint were the least intrusive in view of the values that the denials were intended to serve. And here The judge here ruled that it was undisputed that there is a significant gap in coverage. Is that correct? Is it undisputed? The judge ruled that on summary judgment after the judge gave Sprint a choice of having a trial on this case and submitting further evidence, because unlike the substantial evidence ground, this is an area, the prohibition clause I'm sorry, I'm not making myself clear. Do you agree with Sprint that there is a significant gap of coverage in the city of Palos Verdes? I do not agree with that. Do you agree that if Sprint were to go forward with its new plans that I guess that were the new proposal, that there would be a significant gap in the new proposal for service? I do not for two reasons. One of them is that the areas of non-coverage were maybe less than a half a mile in one direction, less than a quarter mile or less than a quarter mile in another direction. Metro PCS makes clear there are going to be dead areas. That doesn't necessarily mean that you've got a significant gap. The other reason is that these decisions, the coverage maps that were submitted in the administrative record were submitted in 2003, were in 2009. So there was an injunction entered at the district court level saying grant the permits. There's a question now as to whether six years down the road, even if the dead areas that Sprint identified were a significant gap and even if those areas are still dead, after they put in the other equipment they were allowed to put in, they still need that equipment to fill that gap and whether that equipment under today's technology is the least intrusive means to fill those gaps in light of the values to be served, which here should be aesthetic values. What is the difference between a gap in coverage and a dead spot? I don't think, well, there is no difference between a gap in coverage and a dead spot. The difference is between a dead spot and a significant gap in coverage. What's the difference between those two? It depends on the size. It depends on the setting. It depends on the need for wireless communications in that setting. If you've got a dead spot in downtown Los Angeles, that's a whole block, that would be a far different concern than a dead spot in the middle of a residential neighborhood in Palos Verdes Estates. Do we need to send this case back for factual determination on whether or not there's a significant gap in coverage here? I think that if the Court isn't prepared, since Sprint submitted that the issue could be decided, there's two answers to that question. First, Sprint submitted the case to be decided as a matter of law on the significant gap issue based on the administrative record. They denied the invitation to put in more evidence. So this Court could disagree with that and rule there is no significant gap. Or the Court, if not, the Court, I think, would need to send it back after ruling on the aesthetic issue. Because if it's going to decide what's the least intrusive means to fill that gap, it has to decide what legitimate values the denial was intended to serve. Before the Court made the decision on the prohibition issue, it had already decided the substantial evidence issue and ruled that the city could not regulate aesthetics and the city had stepped beyond its authority to regulate the public rights of way. Since that decision, it has been six years, a lot's changed. We've issued our en banc opinion in Sprint. I'm going to assume technology's changed as well. During this time, has the city taken another look at Sprint's proposal? Is Sprint's proposal now outdated? Not to my knowledge. And, in fact, we did some checking just before oral argument, and we saw I do not believe Sprint's put in any further facilities since 2002 in the city. They put in all the facilities that the city allowed them to put in. I also submitted a question to Sprint's attorney as to whether, in light of new technology, is that going to affect the significant gap issue? And the response is, why is technology relevant? So if the Court is not prepared to resolve the prohibition issue at this level, it could not simply affirm the injunction on that ground. It would have to send it back for further proceedings, especially since MetroPCS says this is a fact-intensive issue. Counsel, can we turn to the question of California law and whether you are preempted by 7901 from considering aesthetic effects on the city? Certainly. And there's nothing that Sprint has pointed to that says it is. Specifically on the Pacific Telephone and Telegraph v. San Francisco case from 1961 from the California Supreme Court, that case says that although the 7901 says the city can't demand a franchise and can't exclude telephone equipment from the streets entirely, the municipality retains police power over the place and manner of its installation. And police power, as the cases I've briefed point out, includes aesthetic regulation. And the language, time, place, and manner, which is mentioned in both that case and the, I believe, also the 1959 Pactel v. San Francisco case, and in 7901.1, has been interpreted time and again as a matter of aesthetic regulation. And it has been done by the U.S. Supreme Court, the California Supreme Court, the Ninth Circuit, to permit aesthetic regulation. And, for instance, in the Taxpayers for Vincent case from the U.S. Supreme Court. Well, we somehow seem to have missed that ourselves then. We've got, you've got two opinions here, neither one of which is binding on this Court. One is an opinion by our Court that is an unpublished opinion. The other is an opinion that was depublished from the California Court of Appeal. And they come to opposite conclusions on this point. So it seems to me that it's not, it must not be an obvious answer because we've had two respected courts that considered it and came to opposite conclusions. Now, I understand that you're going to ask us to side with the reasoning of the California Court of Appeal decision. Why is that decision right? Why is our unpublished, our Mem Dispo not persuasive? Well, of course, the Mem Dispo didn't start out as a Mem Dispo. It started out as a published decision. Right, but it is not now, so. And that was, and it was depublished after we filed, I also represented La Cunada-Flintridge in that case. We filed an en banc petition pointing out that time, place and manner issue I just mentioned. Now, if you look at the La Cunada-Flintridge unpublished decision, it all boils down to the Court's interpretation of the word manner. And the Court said, well, we're not quite ready to stretch the word manner to include aesthetic regulation. Well, but, you know, the 7901.1, the time, place and manner does seem to cut in your favor. What seems to cut against you are the last two words in that, in A, which is the ways in which roads, highways and waterways are accessed. And that seems to limit what the time, place and manner refers to. Well, the Public Utilities Commission in a decision that we cited in one of those many supplemental briefs, I believe, interpreted access to mean installation, which ties into the legislative intent that 7901.1 is declarative of existing law, and the Pacific Telephone and Telegraph versus San Francisco case from 1961, which says that the cities have control over the location and  equipment, so it all ties together to a power to control how this equipment is, the equipment and how it's installed, the installation of the equipment, which, if you control the manner, includes how it looks and its impact on the community's aesthetic values. Well, what is being accessed here via the installation? We're accessing the roadway. The city is granting encroachment permits to go into the roadway and install the equipment, and that is the access. But once the equipment's up, there's nothing that interferes with access to the road, right? Well, there's two kinds of access. There's multiple kinds of access. There's access by people using the road to walk, drive, bicycle, et cetera, and there's access in regard of putting equipment in there. The city regulates the access by having all these rules about what can be set up. But the question of access would go to if Sprint wanted to put up a pole and it was going to block, let's say, a bicycle path that ran alongside of a road, that would be one thing, because that would deal with access to a road or things that were pertinent to it. But if what we're talking about is that Sprint wants to paint its poles candy white and red, that just doesn't fit in with the ambiance here in the city. It's purely an aesthetic matter. That doesn't really have so much to do with the access to the road. That's what 7901.1 deals with, is access to the road. It deals with access to the road, but nothing in the statute or in the case law from California or this circuit, other than that unpublished Mem Dispo, limits it to obstructing travel, that sense of access. Well, the question as to whether there's anything in California that limits it to that is an interesting question, because then it depends on whether we start from the presumption that the city has got all powers not reserved by the state, or whether we start from the presumption that the state has all the powers here, except what it delegates back to the municipalities. That's a matter of California state law, and I have to say I'm not an expert on that area. Well, this Court tried to give that to the California Supreme Court. The California Supreme Court gave it back, so... And the answer to that question is in the Pactel v. San Francisco case, which says that the city has the police power to regulate the location and manner of the equipment, and the police power is the power the municipality retains, that it's not given to it by the state.  Could the city simply zone out of certain areas? Could you say, look, you can't put a power, you can't put one of these poles within 500 feet of an elementary school or a church, because it's a blight question? Well, that was dealt with by Metro PCS under the discrimination issue, where it said that under that standard, a community could decide that there are too many antennas in this area, and that is an aesthetic blight. Now, whether you can exclude it entirely from the zone depends probably on how big the zone is, because you also have to deal with the prohibition issue and the post-restriction discrimination restriction. If a city were to say, we don't want any of these poles within 500 feet of an elementary school, is that something that's authorized by 7901, or does it come under some more general power given to municipalities? I think it's both, because, well, it is under 7901.1, because that reserves to local public entities the power to regulate time, place, and manner. What if the pole was up, and after the pole was up, the city had authorized it, a billboard on its pole? Does that still come within 7901, as a time, place, manner, once the pole is already in? The billboards would not be regulated by a telecommunications act. They would be permissible local regulations under Taxpayers for Vincent, from the U.S. Supreme Court, as long as they were valid. Excuse me, I didn't mean to interrupt your... We have a little bit of a delay here. Could the city say, we are going to prohibit the placement of antennas on private property, as an aesthetic matter, that doesn't involve city rights of way? Yes, because you have city rights of way, then 7901 doesn't come into play at all. You just have the telecommunications act, which permits aesthetic regulation as a general matter, and certainly the city of Palos Verdes Estates regulates private property to a great degree. That's in the record. I want to follow up on Judge Silverman's question, because I think it's also a follow-up on something that I asked. If we're trying to regulate antenna, it doesn't have anything to do with 7901, because their antenna is on private property, ham radio operators. Where does the city get its power to be able to regulate that? What is it in California law that says this is properly within the city? Is it something that's granted by the state, or is it something that's inherent in the municipality, unless it's deprived of that by the state? It's granted by the California Constitution, which gives cities police powers. And it's inherent under that system of law in California. It's inherent in the city's ability to regulate, to preserve the safety and health and, yes, the aesthetic values of its cities and its citizens. I want to go back to one more question I asked previously, see if I can narrow it down. So when we look for the city's authority here, are we looking for a grant of such authority from the state, or are we starting from the assumption that the city has the power to do this unless the state has deprived it of that power? The city has the power to do it unless the state has legislatively deprived it of that power. So what we would have to look for here is that the city of Rancho Palos Verdes has a general power to be able to regulate, as a zoning matter, unsightly things in its city unless the state has deprived it of, has exercised some authority to reserve to itself the power to regulate it. Is that correct? Yes, that would be the preemption analysis. And I believe I'm out of time. Unless the Court has any other questions, I'll resume. I don't know if I have any time left. You're out of time, but we occupied your time with our questions, so we'll give you a couple minutes at the end to read back. Thank you, Your Honors. Good morning. My name is John Flynn. I'm the attorney for Sprint PCS Assets, LLC, the appellee in this case. May it please the Court. I'm sure it's not going to surprise anybody in the courtroom that my view of how preemption works in this situation is diametrically different from the view of Judge Bivey. I'm here today for analyzing how 7901 works in this situation, and in particular, Judge Bivey, to answer the question that you just asked about how preemption does work in this context. In the Western Union v. Hopkins case, which is now 98 years old but has never been reversed, has never been modified or altered in any way, nor has it been modified or altered in any way that might apply outside of the rights-of-way. But with respect to the rights-of-way, the Court said, quote, It is universally recognized that the State, in its sovereign capacity, has the original right to control all public streets and highways, and that except insofar as that control is relinquished to municipalities by the State, either by provision of the State Constitution or by legislative act not inconsistent with the Constitution, it remains with the State legislature to be exercised in any manner not prohibited by the State Constitution. Well, why didn't Section 7901 delegate the power to regulate the manner of access to the municipalities? Well, that's what it did do. Right. So there is a delegation. Well, I'm not disputing that point. I think that is correct. But you've got to find the delegation in that statute. And so the question we're all faced with is, what is the scope of that delegation? 7901.1. So you're saying we need to find it in 7901.1? Correct. Okay. So what's your argument under that, why time, place, and manner does not include aesthetic values? Well, time, place, and manner in any other context, and I have to point out, as we have in our briefing, that it's not simply a matter of time, place, and manner. I think Judge Bybee hit the nail on the head when he said the question, when you're talking about time, place, and manner, is always going to be time, place, and manner of what? And it's how you finish that sentence that determines the scope of authority for time, place, and manner regulation. That sentence — I'm sorry. Right. That's right. But the statute continues of accessing. If it meant to limit it to construction, couldn't the state legislator have limited it to construction? Couldn't the state legislature, in other words, have used a less far-ranging term than access? Your Honor, I don't think that access is a far-ranging term. I think that it's defined in the dictionary as gaining entry to the process. We're talking about the process by which a telephone corporation gains access to the right-of-way. And I think that the locking out of Flintridge panel — and I really want to talk a little bit about the reasoning in that case, even though it's de-published, because in the California Court of Appeal decision, which you've been urged to consider, they disagree overtly with the reasoning — Well, neither when can be cited or relied upon. All right. Well, then I'll present it as my own reasoning, then. And in this case, because of the phrase, are accessed, a phrase with which the California Court of Appeal never came to grips. It never addressed the meaning, the critical meaning of that very small phrase. But it has a direct effect on the scope of time, place, and manner regulation that is authorized under 7901.1. It makes all the difference. It makes all the difference. And it's consistent with the legislative intent material that we provided to the Court, both in the lower court and to this Court. In particular, I believe some committee notes on SB 621, which is what resulted in the enactment of 7901.1. And it refers specifically to the problem that it was meant to address. And that problem was a confusion about the scope of local authority to regulate access during construction. That's all that it was about. That phrase really is critical. And in the law, one or two words can make a big, big difference. In this case, it makes all the difference. Are you arguing that access is ambiguous here, that we should turn to the legislative history? No, you don't need to. Well, we only get to it if it is ambiguous. Understood. And certainly the argument by the other side is that it's ambiguous enough to permit another interpretation. And I — well, I think that is their argument. The argument that I'm making is that the meaning is very, very clear. The dictionary definition of our access means the time, place, and manner by which the telephone corporation gains access, gains entry to the right-of-way. Is there any — let me go back to the hypothetical that I gave opposing counsel. Let's suppose that Sprint decided that they wanted everybody to know that as you're driving along America's highways or California's roads, that you're covered by Sprint. And so they're going to paint all of their poles candy-striped. We want you to know that Sprint's with you every mile of your journey. Now, does the city have any recourse on that? It's not an access question. Well, one answer — I'd like to answer that in a couple of ways. One answer is that in the 100-plus years that this statute's been on the books — the city has not painted candy-striped poles. So if there has been an abuse — But, no, we're now down to talking about what is the right of the city to be able to control — Under 79. Can they prevent Sprint from doing that? Can they zone it out? Can they pass a neutral-sounding statute that says, Nobody shall erect a candy-striped pole in the city of Palos Verdes. If it restricts facilities to be placed in the right-of-way, that authority cannot be found under 79.1. Mr. Flynn, isn't the answer that they can say you can't paint it candy-striped so long as it doesn't prohibit coverage in the service area? Isn't that the answer? Well, Your Honor, I think that that's a separate issue, and that's the issue of prohibition. This issue is the substantial evidence issue, and whether there is a legal basis for the city's attempt to exclude right-of-way access on aesthetic grounds. Our argument, obviously, is that there is no such legal basis. Now, you are pointing out another problem that could arise as a result of that kind of an ordinance enacted by the city, but I think legally it's a separate problem. It's a prohibition problem. But in terms of legal authority, the answer is no. And the answer is no what? That the city cannot regulate telephone facilities on aesthetic grounds. Better to be positioned only in the right-of-way. It didn't say anything about telephone facilities. We don't care whether you've got a flagpole in your front yard, or whether you've got a ham radio antenna in the back, or anything that's visible over a height of, let's say, 15, 20 feet may not be painted candy-striped in the city. And so it's broader than your polls. It just happens to include them. I think an ordinance like that would be vulnerable on an as-applied challenge for those telephone companies that are trying to get access to the public right-of-way if the city is attempting to apply that general ordinance to installation of facilities in the public right-of-way. I didn't understand that answer. Mr. Flynn, let me ask you something I asked Mr. Barrow before. Judge Stotler found as a undisputed fact that there is a significant gap in coverage. Looks to me like that is not so undisputed. Can you comment on that? I did notice the way in which she labeled those findings, and I concede that I've seen nothing in the record. I've tried to figure out whether, in fact, it was uncontroverted in the district court. I haven't seen any reason to believe that the matter was conceded by the city. So I do not consider that to be, based on my understanding of the record, I don't consider that to be an undisputed fact. I do consider it to be an established fact by the district court. That is, it was a determination of fact, and I think there's a very, very strong suggestion. How do you have a determination of fact without a trial? I think the court can review the evidence in the record and make a determination, can weigh the evidence and make a determination as a matter of fact. If there's a disputed issue of fact, then it needs to be decided by the fact finder, not as a matter of law. Well, I don't know that I have a good answer to that concern because, as I said, I looked at the record myself and I was unable to reconstruct, even to my satisfaction, how that issue was labeled by the court an uncontroverted or undisputed fact. It seems heavily disputed. It also seems that the factual basis is shifting because it doesn't seem as though there's a significant gap with the current technology, but it seems that there might be with the new technology, if you had to place the new technology in the same places. Your Honor, I honestly don't know whether any of the changes in technology are going to change the particular need that existed in 2003. In fact, I don't think that it does. I think it's still going to have the same coverage capacity. It's going to satisfy the same coverage need. If the technology has changed, that is, if the equipment has changed, I'm confident that it's not going to change the physical profile of the installation. It may have whatever its technological differences might be. I don't think it's going to have any impact at all on the issues before the court in this case. And I think what Judge Stotler may have done in making a decision about the significance of the gap and the fact that there were no lesser intrusive means, I think what she decided, without knowing for sure, is that the evidence was so clear and so conclusive that the fact could be established as a matter of law, and I think she did that. I think that's exactly what she did in ruling on those two issues in the trial court. Now, they're not conceding the issue. That's clear, but it takes more than just saying, we dispute the conclusion that's been argued by the other side. You've got to provide some kind of evidence. There's evidence in the hearing transcript before the city council that Sprint representatives conceded that there wasn't a significant gap with the current installation, but what they wanted to do was to change it, I assume improve it, and that there would be. Now I think I understand better what you're saying. And the whole point of this application was to facilitate, and I apologize for misunderstanding, the whole point of that application was to facilitate the installation of new equipment, new upgraded equipment at these two locations. And it's impossible for any wireless company to provide service to its customers over time without making changes to its technology. It can't be the case that a prohibition can be avoided by a city simply by saying, well, we're not stopping you from operating by using your obsolete technology, and then to say that's not a prohibition. I think that would be inconsistent with the whole theory of the telecommunications act. Is there any finding that the current technology was obsolete or anything, any evidence on that at all? Evidence presented by our client during the administrative proceedings, yes. You know, I'm wondering, this has been going on for almost five years or more. Technology changes, aesthetic considerations change, city councils change. I'm wondering if this is still as hotly contested today as it was back in 2005 or if there's been some, you know, thought toward maybe trying to accommodate Sprint and the city's concerns as well. Is there any movement in that area? Well, Your Honor, no, we haven't, frankly, talked about that. But there's one thing I want to say in response to that that may be obvious, but I think it bears stating. None of these companies, Sprint and none of the other wireless companies, are in the business of making people angry about where they put their facilities or getting crosswise with local agencies who might have to approve future applications. We did have a need that had to be filled. It's not just for cars anymore. It's for people in their houses, people who don't use landlines anymore and need 911 coverage. The gap is still there, Your Honor. The need to satisfy that gap is still there. I think the record describes very, very vividly the efforts that we made to accommodate the stated concerns of the city council and the local residents. But there was no perfect solution. It would be wonderful if there were, and we would like people to be happy with how our facilities are installed, how they operate, because putting aside any of the moral aspects of the question, it's also good business. But we haven't been able to find a way to take care of that need by lesser intrusive means. You have certain height requirements that you need. You've got certain topographical constraints that you have to work with. You have to be sure not to interfere with any signals that might be propagating in the valley down below. All of these things were weighed very, very heavily, very carefully. We went through an administrative process that lasted a long, long time, listening to the local residents so that we could change the facility. And remember, we lowered for the Via Valmonte site, we lowered the pole from 44 feet to 30 feet, which had a very, very significant effect that it was going to have on the visual effects that were complained about by one of the neighbors. We worked very, very hard to find the least intrusive means. And Judge Stotler was right when she said that we had found the least intrusive means and we had a significant gap. I don't think there's any other way to fill this gap. What does Sprint do in other communities that don't have the above-ground poles, utility poles that Palos Verdes Estates has? The undergrounding of public utilities is something that can only apply to landline telephone service. For wireless service, you've got to have, because the antennae have to be able to see, as it were, because it's a line-of-sight technology, it's got to be able to see the drivers and the users, and the users and drivers have to be able to see the facility. So it's got to be above ground. Right, so where do you place it in other communities where they don't have these existing poles? You have to add a pole. Or you can add it to – there are some very, very nice designs that work for streetlight standards where the owner of the streetlight is willing to accommodate that need, and we've used that in other communities, but we weren't able to use it in this situation. I'm just – and this is personal experience, but I'm just thinking of my own community where I live. I've never seen an installation that looks quite like what I'm looking at in the pictures that are exhibits, and I'm just wondering where are they all hidden, because I certainly have cell phone usage. Well, when you can, you design stealth facilities. I mean, that's another thing that the wireless companies try to do whenever they can. Really, they really do want to keep people happy. And that would be the least intrusive means, right? And so what is it about Palos Verdes Estates that prevents you from installing stealth facilities? You've got to – you've got a height requirement. You've got an existing telephone pole on Via Azalea, so make use of the existing telephone pole. There was a modification to that pole. But there's no – there is no stealth requirement. There was no stealth requirement. In fact, stealthing was not an issue for the city of Palos Verdes Estates. It was location. We don't want it in this location. Right, but it's part of the requirements of least intrusive means, right, if you could do a stealth installation and still accomplish. I have no – I honestly don't know, because I don't have the technical capability to be able to answer the question whether a stealth facility would be technically feasible at that location. I simply don't know the answer to that. It never – as far as I know, it never came up during the trial court proceedings. Yeah, okay. Thank you. Does anyone have any other questions? No, thank you very much. Thank you, counsel. I'll give you two minutes to respond. Did you have – okay, go ahead. There is one last point that I would like to make, and I didn't get to say all that I wanted to say. However, I do think that if the Court focuses on the arguments that we presented in our February 22nd, 08 supplemental brief after denial of certification, I think that you will find all of the answers to the points that Mr. Baer has made that I have not been able to respond to yet. All right. Thank you, counsel. Thank you. Thank you, Your Honors. To respond to Mr. Flynn's last point, the good citizens argument, certainly Sprint wants to keep some goodwill, but its main business is to put in place good cellular equipment and good cellular service and to make money for the company. That's how it does it. And the city certainly has an interest in providing good wireless services for its citizens. It also has an interest in preserving the aesthetic values. That's why in the En Banc Sprint v. County of San Diego case, the Court said that a local board, if it had discretion over aesthetic values, might use it to prohibit all service, but it's more likely it will use it to balance those two interests, providing wireless service and serving aesthetic values. It's important to keep in mind something that was said in the Cellular Telephone Company v. Borough of Hohoku's case from the Third Circuit, which is cited in the briefs, which is that the Telecommunications Act doesn't abrogate local zoning authority in favor of offering optimal service to all customers, only a reasonable level of service. There's got to be a balancing there, and Congress intended that balancing be done by the local authorities, and that's why the local authorities should be given the freedom to do that balancing if the law allows. Unless the Court has any questions, I'll submit. All right. Thank you very much, Counsel. This session of this Court is adjourned for today.
judges: Silverman, Wardlaw, Bybee